DAVID W. SLAUGHTER (2977)
HEATHER S. WHITE (7674)
SCOTT C. POWERS (10976)
SNOW CHRISTENSEN & MARTINEAU
*Attorneys for Plaintiff*
   *The Guarantee Company of North America, USA*
10 Exchange Place, 11th Floor
Salt Lake City, Utah  84111
Telephone: (801) 521-9000
ds@scmlaw.com
hsw@scmlaw.com
scp@scmlaw.com

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **THE GUARANTEE COMPANY OF NORTH AMERICA USA**, a corporation,<br><br>Plaintiff,<br><br>vs.<br><br>**A4 CONSTRUCTION COMPANY INC.**, a Utah corporation; **SHAWN M. ANDERSON**, an individual; **AMY M. ANDERSON**, an individual; and **PERRY AND ASSOCIATES, INC.**, a Utah corporation,<br><br>Defendants. | **COMPLAINT FOR INDEMNITY AND RECOVERY OF SURETY LOSSES, COSTS AND EXPENSES; BREACH OF FIDUCIARY DUTY; INJUNCTIVE AND QUIA TIMET RELIEF; AND REPLEVIN (*redacted*)**<br><br><br><br>Case No. 2:22-cv-00280-DAO<br><br>Magistrate Judge Daphne A. Oberg |

Plaintiff The Guarantee Company of North America USA ("Surety") complains of defendants and alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff, The Guarantee Company of North America USA ("GCNA" or "Surety") is a corporation organized under the laws of the state of Michigan, with its principal place of

business in that state.  At all times relevant hereto, Surety was duly authorized under the laws of the State of Utah and elsewhere to act as a corporate surety for the execution of statutory performance bonds and payment bonds for contractors in connection with public and private construction projects, including, but not limited to, projects for the United States of America.

2.      Defendant A4 Construction Company, Inc. ("A4") is a corporation incorporated under the laws of Utah with its principal place of business in Sandy, Utah. At all relevant times, A4 conducted business as a general contractor.

3.      A4 is also believed to be or holds itself as a woman-owned small business concern operating under the Women-Owned Small Business 8(m) Federal Contract Program. *See* 15 U.S.C. §§ 632, *et seq.* (Small Business Act).

4.      Amy M. Anderson is an individual who, on information and belief, is a citizen of Utah residing in Salt Lake County, Utah. Mrs. Anderson is believed to be the president of A4.

5.      Shawn M. Anderson is an individual who, on information and belief, is a citizen of Utah residing in Salt Lake County, Utah. Mr. Anderson is believed to be the vice president and the registered agent of A4.

6.      Perry and Associates, Inc., is a corporation incorporated under the laws of Utah with its principal place of business in Murray, Utah.

7.      Defendants are sometimes collectively herein referred to as "Indemnitors."

8.      This action seeks the enforcement of Surety's legal and equitable rights, as a corporate surety, under a General Agreement of Indemnity and otherwise for protection against its exposure for, and recovery of, all losses, costs, expenses, and attorneys' fees, including all costs of investigation, resulting from or related to A4's default and termination under two federal project

2

contracts and claims arising under or asserted against contract-related bonds issued by Surety for Indemnitors.

9. Surety also seeks equitable relief, including this Court's order of specific performance of Indemnitors' obligations under the General Agreement of Indemnity, requiring that Indemnitors post cash or other acceptable collateral of a type and of a value sufficient to secure Surety's protection from losses, costs and expenses incurred on Indemnitors' behalf, a prejudgment writ of replevin for the recovery of certain property in which Surety has either an ownership interest (through outright assignment) or a security interest, through the parties' Indemnity Agreement, as defined below and/or injunctive relief to prevent the transfer and dissipation of Surety's collateral, which would jeopardize Surety's rights.

10. Surety also seeks preliminary injunctive relief requiring A4's delivery of all documents and records relating to the bonded contracts and projects, including but not limited to job cost records and other financial documents under the terms of the General Agreement of Indemnity described herein.

11. This controversy is between citizens of different states, and the matter in controversy exceeds $75,000, exclusive of interest and costs. This Court therefore has diversity jurisdiction, pursuant to 28 U.S.C. § 1332, and venue properly lies in this District.

## FACTUAL BACKGROUND/GENERAL ALLEGATIONS

12. Surety realleges and incorporates herein each and every allegation in the foregoing paragraphs.

13. At all times relevant hereto, A4 conducted business as a general contractor on various projects, including private and public works projects for which contractor or subcontractor performance or labor and material payment bonds were required by contract or statute.

3

14.     On or about January 20, 2016, in connection with A4's application for contractor bonding, A4 and Indemnitors Amy Anderson and Shawn Anderson executed and delivered to Surety a General Agreement of Indemnity (hereinafter referred to as the "Indemnity Agreement"), a true and correct copy of which is attached hereto as Exhibit A and by this reference is fully incorporated herein.

15.     In early 2019, A4 responded to solicitations from the United States Army Corps of Engineers ("USACE") and was subsequently awarded contracts for the construction of the following projects located at Fort Carson, Colorado (collectively, the "Projects"):

a.      The *Special Operations Forces Mountaineering Facility*, ultimately identified to Contract No. W9128F-19-C-0016 (the "Mountaineering Contract"), with an original contract amount of $8,794,325.00; and

b.      The *Special Operations Forces Human Performance Training Facility*, ultimately identified to Contract No. W9128F19C0018 (the "HPTC Contract"), with an original contract amount of $12,309,817.00.

(The referenced contracts are sometimes hereinafter collectively referred to as the "Bonded Contracts.")

16.     As the prime contractor on the Projects, A4 was contractually responsible for timely completion of the construction of all required improvements and the timely payment to lower-tier subcontractors and suppliers.

17.     A4 was also obligated to procure and post payment and performance bonds for the Projects, in accordance with 40 U.S.C. §§ 3133 *et seq.* (the Miller Act) and applied to Surety for the required bonds.

18.     On information or belief, A4 and Perry & Associates, Inc., entered into a joint venture arrangement, styled as a "Teaming Agreement," under which Perry & Associates agreed to provide both accounting and administrative support to A4 on the Projects in consideration for a share of A4's profits. A true and correct copy of the Teaming Agreement is attached as Exhibit B and by this reference incorporated herein.

19.     On information or believe, Defendants failed to properly disclose the "Teaming Agreement" and related profit arrangement between A4 and Perry & Associates to USACE, in violation of applicable federal regulations, including, but not limited to, the requirements of identification and registration with the Government contracting agency, under 13 CFR 121.103(h).

20.     On or about April 30, 2019, William Perry IV, in his capacity as Vice President and General Counsel for Perry & Associates, Inc., and pursuant to the arrangement among Indemnitors, executed and caused to be delivered to Surety a Rider, to be attached to and form a part of the A4 Indemnity Agreement, binding Perry & Associates to the Indemnity Agreement as to any loss associated with Surety's Bonds No. 11166727, furnished to USACE for the Mountaineering Project. A true and correct copy of the referenced Rider is attached as Exhibit C-1 and by this reference incorporated herein.

21.     On or about May 20, 2019, Perry & Associates, Inc., over the signature of William Perry IV, as its Vice President and General Counsel, executed and caused to be delivered to Surety a Rider, to be attached to and form a part of the A4 Indemnity Agreement, binding Perry & Associates to the Indemnity Agreement as to any loss associated with Surety's Bonds No. 11166730, furnished to USACE for the HPTC Project.  A true and correct copy of the referenced Rider is attached as Exhibit C-2 and by this reference incorporated herein

22.     Surety furnished contractor performance and payment bonds for the respective Projects.  Copies of the payment and performance bonds, collectively identified as Bonds No. 1116627, furnished to USACE for the Mountaineering Project (the "Mountaineering Bonds"), are attached as Exhibit D-1; copies of the payment and performance bonds, collectively identified as Bonds No. 11166730, furnished to USACE for the HPTC Project (the "HPTC Bonds"),are attached as Exhibit D-2.  All such bonds are sometimes collectively referred to herein as the "Bonds."

23.     The Indemnity Agreement expressly states that execution of the Indemnity Agreement was an inducement to the Surety to provide the Bonds for A4.

24.     Surety relied upon the Indemnity Agreement executed by all Indemnitors in providing the Bonds.

25.     Under the terms of the Indemnity Agreement, the Defendants, as indemnitors, are jointly and severally responsible to indemnify Surety from and against any losses, costs, liability and claims incurred in relation to Surety having issued the Bonds.

26.     The Indemnity Agreement provides specifically, in part, as follows:

**INDEMNITY TO SURETY:** Indemnitors agree to pay to Surety upon demand:

1. All loss, costs and expenses of whatsoever kind and nature, including court costs, attorney fees (whether Surety at its sole option elects to employ its own attorney, or permits or requires Indemnitors to make arrangements for Surety's legal representation), in-house fees, consultant fees, investigative costs and any other losses, costs or expenses incurred by Surety by reason of:

   a.   Surety having executed, provided or procured any Bond;

   b.   any default under this Agreement by any of the Indemnitors;

   c.   Surety enforcing any of the covenants or conditions of this Agreement;

   d.   Surety conducting any investigation, obtaining or attempting to obtain a release, or recovering or attempting to recover a loss or unpaid premium in connection with any Bonds; and/or

6

e.    Surety prosecuting or defending any action or claim in connection with any Bonds executed provided or procured on behalf of Principal or Indemnitors, whether Surety at its sole option elects to employ its own counsel, or permits or requires Indemnitors to make arrangements for Surety's legal representation. In addition the Indemnitors agree to pay Surety interest on all disbursements made by Surety in connection with such loss, costs and expenses incurred by Surety at the maximum rate permitted by law calculated from the date of each disbursement;

2.    Any amount sufficient to discharge any claim made against Surety on any Bond, whether Surety will have made any payment or established any reserve therefor.  Such payment shall be equal to the larger of (a) the amount of any reserve set by the Surety, or (b) such amount as the Surety, in its sole judgment, shall deem is sufficient to protect it from loss.  This sum may be used by Surety to pay such claim or be held by Surety as collateral security against loss on any Bond.  Surety shall have no obligation to invest or provide a return on the funds deposited.  The Indemnitors acknowledge that their failure to pay, immediately and upon demand, that sum demanded by Surety will cause irreparable harm for which Surety has no adequate remedy at law.  The Indemnitors confirm and acknowledge that Surety is entitled to injunctive relief for specific enforcement of the foregoing provision.

27.    The Indemnity Agreement further provides, in part, as follows:

**CLAIMS AGAINST THE SURETY:** With respect to claims against Surety, Indemnitors agree that:

1.    Surety shall have the exclusive right for itself and the Indemnitors to determine in its sole and absolute discretion whether any claim or suit upon any bond shall, on the basis of belief of liability, expediency or otherwise, be paid, compromised, defended or appealed.

2.    Surety may incur such expenses, including attorneys' fees, as deemed necessary or advisable in the investigation, defense and payment of such claims and completion of any Contract with respect to which Surety has issued any Bond.

3.    In the event of any payment of any kind by the Surety, the Indemnitors further agree that the liability of the Indemnitors shall extend to and include, and the Surety shall be entitled to charge and recover for, any and all disbursement made by it in good faith under the belief that:

a.    any Principal or Indemnitor is or has been in default under or pursuant to this Agreement;

b.    the Surety was or might be liable to pay the claims asserted or the sums paid, whether or not such liability actually existed; or

c.    such payments were or are necessary or expedient, in the Surety's sole and absolute discretion, to protect any of the Surety's rights or interests

7

or to avoid or lessen the Surety's liability or alleged liability, whether or not such liability, necessity or expediency actually existed.

28.    Pursuant to the terms of the Bonds, A4 (as Principal) and Surety (as Surety) were bound to USACE (as Obligee) to accomplish performance of the Bonded Contracts and to pay all claimants, as defined by the Bonds and under relevant statutes, for labor performed and materials used or reasonably required for use in the performance of the Bonded Contracts.

## THE MOUNTAINEERING CLAIMS

29.    Surety realleges and incorporates herein each and every allegation in the foregoing paragraphs.

30.    By letter dated January 14, 2022 USACE declared A4 to be in default of the Mountaineering Contract and issued a "Termination for Default" letter to A4, terminating A4's right to continue work on the Mountaineering Project. A true and correct copy of the Mountaineering Contract Termination for Default is attached as Exhibit E and by this reference incorporated herein.

31.    USACE's declaration of A4's default and the termination of A4's right to proceed under the Mountaineering Contract each constitute an "Event of Default" under the Indemnity Agreement.

32.    As a result of A4's default and termination under the Mountaineering Contract, USACE made demand on Surety under Performance Bond No. 11166727 to arrange for completion of the uncompleted Mountaineering Contract work.

33.    Pursuant to its obligations under Performance Bond No. 11166727, Surety entered into a takeover agreement with USACE and engaged a completion contractor to coordinate completion of the uncompleted Mountaineering Contract work.

8

34.     As a result of A4's default and termination under the Mountaineering Contract, Surety is faced with the costs of negotiating with A4 suppliers and subcontractors the ratification of terms and pricing under their respective subcontracts or supply contracts and otherwise engaging their cooperation in providing materials or subcontract work required for completion of the Mountaineering Project.

35.     Multiple A4 suppliers and subcontractors have made demand on Surety under Payment Bond No. 11166727 for the unpaid value of labor, materials and/or equipment furnished to and/or on behalf of A4 for the Mountaineering Project, alleging, in part, that A4 failed or refused to timely pass through payments A4 received from USACE under the Mountaineering Contract, as required under the Federal Prompt Payment Act, 31 U.S.C. § 3905, and contrary to A4's certifications to USACE under FAR 52.232-5 that it had properly passed through to and paid all lower tier subcontractors and suppliers from funds received under pay requests for their work.

36.     Indemnitors' failure to pay, to the extent due, claims, bills or other indebtedness incurred in connection with the Mountaineering Contract constitutes an "Event of Default" under the Indemnity Agreement.

37.     Surety has regularly, routinely and promptly notified Indemnitors upon Surety's receipt of notices, claims or lawsuits from the various claimants and provided Indemnitors a reasonable opportunity to respond to and resolve each payment bond claim directly and otherwise to hold Surety harmless therefrom.

38.     Indemnitors' efforts, if any, to resolve or otherwise address the claims on Payment Bond No. 11166727 were and have been insufficient to compromise and satisfy the various claims or to defend and hold Surety harmless against said claims, constituting a breach of the Indemnity Agreement.

39.     As a result of Indemnitors' failure to resolve various claims on Payment Bond No. 11166727, and to actively participate in efforts to enlist subcontractors' and suppliers' cooperation in the completion of the Mountaineering Contract, Surety has been required to investigate, negotiate, compromise and satisfy, resolve or defend against claims or lawsuits as they have arisen, and has incurred losses, costs and expenses in that connection and in connection with its negotiations with subcontractors and suppliers to assist in completion of Contract work.

40.     As a result of Indemnitors' failure to resolve various claims on Payment Bond No. 11166727, Surety also faces litigation over enforcement of an unsatisfied arbitration award against A4 and in favor of RME Ltd., LLC, in amounts exceeding $500,000.00.

41.     To date, Surety has incurred losses under Payment Bond No. 11166727 totaling not less than $296,758.45, plus fees and costs of consultants and attorneys, and it will continue to incur losses thereunder for claims unresolved as of the date of this Complaint.

42.     Surety has likewise incurred costs and expenses, including attorneys' fees and consultant fees, related to the investigation, negotiation, and settlement of various claims on the Mountaineering Bonds, and it will continue to incur costs and expenses in that connection until Surety recovers full reimbursement of its losses, costs, and expenses from Indemnitors.

43.     As a result of the foregoing and taking into account projected costs of completing the Mountaineering Contract in excess of contract balances held by USACE, Surety has established current loss reserves against the Mountaineering Bonds totaling over $3,000,000.00.

## THE HPTC CLAIMS

44.     Surety realleges and incorporates herein each and every allegation in the foregoing paragraphs.

10

45.     By letter dated March 28, 2022, USACE declared A4 to be in default of the HPTC Contract and issued a "Termination for Default" letter to A4, terminating A4's right to continue work on the HPTC Project. A true and correct copy of the HPTC Contract Termination for Default is attached as Exhibit F and by this reference incorporated herein.

46.     USACE's declaration of A4's default and the termination of A4's right to proceed under the HPTC Contract each constitute an "Event of Default" under the Indemnity Agreement.

47.     As a result of A4's default and termination under the HPTC Contract, USACE made demand on Surety under Performance Bond No. 11166730 to arrange for completion of the uncompleted HPTC Contract work.

48.     Pursuant to its obligations under Performance Bond No. 11166730, Surety is negotiating a takeover agreement with USACE to coordinate completion of the uncompleted HPTC Contract work.

49.     As a result of A4's default and termination under the HPTC Contract, Surety is faced with the costs of negotiating with A4 suppliers and subcontractors the ratification of terms and pricing under their respective subcontracts or supply contracts and otherwise engaging their cooperation in providing materials or subcontract work required for completion of the HPTC Project.

50.     Multiple A4 suppliers and subcontractors have made demand on Surety under Payment Bond No. 11166730 for the unpaid value of labor, materials and/or equipment furnished to and/or on behalf of A4 for the HPTC Project, alleging, in part, that A4 failed or refused to timely pass through payments A4 received from USACE under the HPTC Contract, as required under the Federal Prompt Payment Act, 31 U.S.C. § 3905, and contrary to A4's certifications to USACE

11

under FAR 52.232-5 that it had properly passed through to and paid all lower-tier subcontractors and suppliers from funds received under pay requests for their work.

51.     Indemnitors' failure to pay, to the extent due, claims, bills or other indebtedness incurred in connection with the HPTC Contract constitutes an "Event of Default" under the Indemnity Agreement.

52.     Surety has regularly, routinely and promptly notified Indemnitors upon Surety's receipt of notices, claims or lawsuits from the various claimants and provided Indemnitors a reasonable opportunity to respond to and resolve each payment bond claim directly and otherwise to hold Surety harmless therefrom.

53.     Indemnitors' efforts, if any, to resolve or otherwise address the claims on Payment Bond No. 11166730 were and have been insufficient to compromise and satisfy the various claims or to defend and hold Surety harmless against said claims, constituting a breach of the Indemnity Agreement.

54.     As a result of Indemnitors' failure to resolve various claims on Payment Bond No. 11166730, Surety has been required to investigate, negotiate, compromise and satisfy, resolve or defend against claims as they have arisen, and has incurred losses, costs and expenses in doing so.

55.     To date, Surety has incurred losses under Payment Bond No. 11166730 totaling $1,718,843.95, plus fees and costs of consultants and attorneys, and it will continue to incur losses thereunder for claims unresolved as of the date of this Complaint.

56.     Surety has likewise incurred costs and expenses, including attorneys' fees and consultant fees, related to the investigation, negotiation, and settlement of various claims on the HPTC Bonds, and it will continue to incur costs and expenses in that connection until Surety recovers full reimbursement of its losses, costs, and expenses from Indemnitors.

57.     Furthermore, A4 is incurring liquidated damages under the HPTC Contract for its failure to timely complete its work thereunder, which liquidated damages are being charged against remaining HPTC Contract balances.

58.     As a result of the foregoing, Surety has established loss reserves against the HPTC Bonds totaling over $2,850,000.00 to date.

### DEMANDS FOR COLLATERAL AND INDEMNIFICATION

59.     Surety realleges and incorporates herein each and every allegation in the foregoing paragraphs.

60.     Surety has made numerous demands upon Indemnitors to satisfy outstanding claims against the Bonds and to post sufficient cash collateral or other security satisfactory to Surety in type and amounts to protect Surety from any additional losses, costs, and expenses resulting from the claims against the Bonds.

61.     Perry & Associates alone has responded to Surety's demands (in part and only recently) by paying approximately $1.6 million into an escrow account to offset projections of the substantial sum that has been and will be required to pay unpaid suppliers and subcontractors amounts due for work in place on the Mountaineering Project and to assist in negotiation of ratification agreements required to persuade them to continue or return to both projects.

62.     To date, even taking into account the recent payment from Perry, Indemnitors have failed and/or refused to satisfy fully their obligations under the Indemnity Agreement to repay and reimburse Surety's losses, costs, and expenses; to protect and hold Surety harmless from claims asserted against the Bonds; and to deposit cash collateral or other security as demanded, each constituting a breach of and an "Event of Default" under the Indemnity Agreement.

63.     Surety was required to retain legal counsel and to incur other costs, fees and expenses in bringing this action, and it will continue to incur litigation costs and attorneys' fees by reason of Surety having furnished the Bonds.

64.     Under terms of the Indemnity Agreement, Surety is entitled to reimbursement from Indemnitors of all costs, fees, and expenses incurred in prosecuting this action.

65.     Consistent with the express language of the Indemnity Agreement, Surety is also entitled to interest on all losses and expenses resulting from the claims against the Bonds, calculated at the statutory rate of 10% per annum (simple interest), applicable under Utah law and calculated from the date of each of Surety's loss payments under the Bonds, to the date of judgment or award, and thereafter at the applicable legal post-judgment rate.

## FIRST CLAIM FOR RELIEF
### (Breach of Indemnity Agreement)

66.     Surety realleges and incorporates herein each and every allegation in the foregoing paragraphs.

67.     Under the Indemnity Agreement, Indemnitors are jointly and severally liable to Surety for the total of all losses, costs, and expenses, including attorneys' fees, that Surety has sustained or might yet sustain or incur as surety for A4 and as a result of, or in connection with, the Bonds and Bonded Contracts.

68.     As a result of having executed and furnished the Bonds, and by reason of Indemnitors' default in their obligations, Surety has incurred losses, costs and expenses in the combined principal amount of more than $2.2 million to date, and reasonably anticipates that it will continue to incur losses, costs, and expenses, including costs and fees of consultants and

attorneys, before ultimate resolution of this matter, in amounts supporting Surety's current calculation of loss reserves.

69.     Under the Indemnity Agreement, Indemnitors agreed to pay to Surety upon demand, *inter alia*, amounts sufficient to discharge all claims made against the Bonds; the amount of any reserve set by Surety; or such amounts deemed by Surety to sufficiently protect it from loss.

70.     With the exception of Perry's payment, acknowledged herein, Indemnitors have failed to comply with and perform their obligations and duties under the Indemnity Agreement to discharge all claims against the Bonds and to pay to Surety upon demand amounts sufficient to protect Surety from loss.  To the contrary, as to A4 specifically and by way of example only, following a March 16, 2022 email inquiry from counsel for an unpaid subcontractor, RME Ltd., LLC, into A4's intentions to pay an arbitration award of $440,949.00 in RME's favor and against A4 for recovery of amounts owed on the Mountaineering Project, A4's counsel responded in terms defiant of A4's obligations under the Indemnity Agreement to hold Surety harmless from contract-related losses and liability:  "*We met with Shawn [Anderson] a few minutes ago and we'll want the bonding company to pay this claim. . . . Do you want to provide them with the award and ask for payment, or do you want A4 to do that?*"

71.     By their failure and/or refusal to honor their obligations under the Indemnity Agreement, Defendants are in breach of the Agreement.

72.     Surety has demanded and hereby again demands that Indemnitors comply with the terms and provisions of the Indemnity Agreement, including their indemnity obligations thereunder, and immediately pay to or deposit with Surety the sum of $5,850,000.00, reflecting the total of Surety's calculated exposure, reflected by its loss reserves, of Surety's actual losses, costs and expenses to date, plus its calculated exposure for further payment claims and

15

performance losses under the Bonds, with such additional amounts or other adjustments as may be established at any ultimate trial or earlier dispositive motion.

73.     Without waiving its rights to injunctive or other equitable relief in a form to protect against further losses, Surety is currently entitled to recover damages resulting from by Indemnitors' breach of their obligations under the Indemnity Agreement in an amount to be proven at trial or dispositive motion, but in no case less than its current loss reserves of $5,850,000.00, reflecting the combined total of Surety's losses, costs, and expenses to date, plus its calculated exposure for further payment claims and performance losses under the Bonds, net of any recovery from USACE of any contract balances, with such additional amounts or other adjustments as may be established at any ultimate trial or dispositive motion.

74.     Surety is further entitled to recover interest, both prejudgment and post-judgment, on amounts actually expended prior to any recovery from Indemnitors, calculated at the applicable statutory legal rate from the date of each loss or advance of funds, plus such additional amounts as may be necessary to fully reimburse and indemnify Surety against its costs and expenses, incurred hereafter, under or as a result of the Bonds.

## SECOND CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)

75.     Surety re-alleges and incorporates herein each and every allegation in the foregoing paragraphs.

76.     Indemnitors agreed in the Indemnity Agreement that all proceeds from any and all Bonded Contracts are to be held in trust "as trust funds for and shall be used *solely* for:

a.   the performance of the contract;
b.   the payment of obligations to subcontractors, laborers, and suppliers of materials and services incurred or to be incurred in the performance of the contract for which Surety is or may be liable under Bonds and;

16

    c.  the satisfaction of Indemnitors' obligations to Surety under this Agreement and all other indebtedness and liabilities of Indemnitors to Surety."

(Emphasis added).

77.    This provision in the Indemnity Agreement created a fiduciary duty, owed by all Indemnitors, to hold proceeds from the Bonded Contracts in trust, to be used to satisfy claims of subcontractors and suppliers, as well as to satisfy Indemnitor's obligations to indemnify Surety under the Indemnity Agreement.

78.    On information and belief, A4 received proceeds from USACE on the Bonded Contracts.

79.    On information and belief, Indemnitors failed to assure A4's compliance with the the Federal Prompt Payment Act, requiring that it pass through to suppliers and subcontractors payments received by A4 from USACE upon payment applications reflecting performance by A4's respective suppliers and subcontractors, and have not otherwise maintained those contract proceeds in trust or used them as required by the Indemnity Agreement, consistent with their fiduciary responsibility.

80.    Indemnitors have therefore breached that fiduciary duty to the Surety.

81.    Surety has been damaged by Indemnitors' breach of fiduciary duty, in an amount to be proven at trial or dispositive motion, but in no case less than the difference between the totals of payments received from USACE and amounts paid through to A4 suppliers and subcontractors, for whose work or materials A4 received payment, together with interest at the legal rate, costs and expenses (including reasonable attorneys' fees) to date, and such additional amounts as may be necessary to fully reimburse and indemnify Surety against its losses, costs and expenses, incurred hereafter, under or as a result of the Bonds.

17

## THIRD CLAIM FOR RELIEF
### (Specific Performance of Indemnity Agreement)

82.     Surety incorporates by reference each and every allegation contained in the preceding paragraphs of its Complaint.

83.     The Indemnity Agreement is the proper subject of and is sufficiently definite and certain on its face for specific performance and enforcement.

84.     The consideration flowing from Surety to Defendants under the Indemnity Agreement was adequate, and the Indemnity Agreement is just and reasonable.

85.     Defendants have breached the Indemnity Agreement by delaying, refusing or otherwise failing fully to perform their obligations to Surety thereunder, including satisfying the claims currently asserted against Surety or otherwise depositing adequate funds or posting sufficient collateral for Surety's benefit and protection.

86.     Surety has made demand or hereby makes demand upon Defendants to deposit funds or otherwise provide collateral of a type and amount satisfactory to cover Surety's potential liability under the Bonds.

38.     Surety's remedy at law as it relates to Surety's demand for exoneration from or collateral against exposure under the Bonds is inadequate because, unless the Court orders Defendants and each of them to satisfy claims against the Bonds, deposit funds, or post collateral, Surety will be required to continue to use its own funds to pay claims on the Payment Bonds and to complete A4's contract work or otherwise respond to USACE's claims on the Performance Bonds, and Defendants, and each of them, between now and the time of trial, will have the ability to dispose of or divert their assets so that, at the time of trial, there will be inadequate assets available to satisfy any judgment that Surety may obtain under the terms of the Indemnity Agreement.

18

39.     Pursuant to the Indemnity Agreement, A4 and Indemnitors also agreed to provide Surety with free access to their books and records, and particularly those related to the Bonded Contracts.

40.     Surety has repeatedly demanded, and hereby again demands that A4 and the individual Indemnitors, as A4's principals and officers, as those in possession or control, promptly to provide access to A4's books, records and accounting information described in the Indemnity Agreement, including but not limited to records relating specifically to the Bonded Contracts.  To date, and despite repeated assurances that they would be furnished, A4 has furnished no accounting books or records and only limited copies of project documents relating to the Mountaineering Project.

41.     Surety's remedy at law is inadequate also as it relates to A4's books and records because, unless the Court orders that A4 and the individual Indemnitors provide access to their books and records, Surety will be unable, or hindered in its ability, to timely and efficiently address project-related liabilities, including identifying defenses, if any, to the claims against the Bonds or the amounts justly due and owing, if any, to Bond claimants.

42.     Surety is entitled to an order of specific performance requiring Defendants to perform their obligations under the Indemnity Agreement, including their obligation to indemnify Surety and keep it indemnified against claims, liability, losses, costs, and exposure under the Bonds and to provide funds or other collateral in an amount sufficient to cover and protect Surety from ongoing losses, costs and expenses, to provide access to A4's books and records, and to pay Surety's attorney fees incurred in this action.

19

## FOURTH CLAIM FOR RELIEF
### (Replevin)

87.   Surety re-alleges and incorporates herein each and every allegation in the foregoing paragraphs

88.   In the Indemnity Agreement, the Indemnitors both *assigned* to Surety—and also granted Surety a security interest in—"all rights of the Indemnitors in, or in any manner growing out of" the following property:

a.   all rights of the Indemnitors in all contracts referred to in the Bonds, or secured by the Bonds and all money or property due or to become due Indemnitors arising out of or in any way relating to contracts performed by Indemnitors, whether secured by Bonds executed by Surety or not, including, but not limited to, accounts receivable, progress payments, deferred payments, retained percentages, compensation for extra work and claims and the proceeds thereof;

b.   all rights of the Indemnitors in all contracts, including, but not limited to, unbonded contracts and/or contracts bonded by another surety, and all money or property due or to become due Indemnitors arising out of or in any way relating to such contracts, including, but not limited to, accounts receivable, progress payments, deferred payments, retained percentages, compensation for extra work and claims and the proceeds thereof;

c.   all the right, title and interest of the Indemnitors in and to all machinery, equipment, vehicles, rolling stock, materials, inventory, leaseholds, fuel, plant, tools, furniture, goods, and personal and fixture property;

d.   all money, cash, cash equivalents, bank accounts, deposit accounts (checking or savings), certificates of deposit, securities, bonds, negotiable instruments, instruments (including promissory notes), letter of credit rights, and all other investment property;

e.   all subcontracts and purchase orders on projects in connection with which the Indemnitors have entered into contracts secured by Bonds executed by Surety and all surety bonds, undertakings or guarantees which secure said subcontracts or purchase orders;

f.   all materials purchased for all contracts referred to in the Bonds, or secured by the Bonds, including material which is in the process of manufacture, in storage at any storage facility, or in transit to any project site;

g.   all licenses, patents, copyrights and trade secrets;

h.   all claims, causes of action, actions or demands and the proceeds thereof which Indemnitors may have against any subcontractor, vendor, materialman, owner,

architect, engineer, accountant or others, whether arising out of contracts secured by Bond(s) executed by Surety or not;

i. all money, claims or causes of actions due, claimed or receivable on insurance policies including life insurance proceeds, builder risk policies, fire policies and casualty policies;

j. all warehouse receipts, bills of lading, general intangibles and farm products;

k. all tax refunds or claims for tax refunds;

1. all limited partnership and general partnership interests.

The foregoing items of property shall be referred to, collectively, as the "Collateral."

89. Surety perfected its assignment and security interest in the Collateral by filing UCC-1 Financing Statements—in the names of all Indemnitors—with the Utah Department of Commerce, Division of Corporations and Commercial Code, and with the state of Colorado.

90. A portion of the Collateral consists of vehicles and equipment owned by A4 (the "Equipment").

91. On information and belief, A4 has sold or is attempting to sell all or part of the Equipment.

92. The Indemnity Agreement states that the assignment and security interest is effective as of the date of the Indemnity Agreement but "enforceable only in the event of the occurrence of an Event of Default," as defined therein.

93. The Indemnity Agreement defines an "Event of Default," among other things, as:

a. The declaration by any obligee or owner under the Bonds that Indemnitors—or any of them—are in default under a Bonded Contract;

b. If Indemnitors "fail to pay, to the extent due, in whole or in part, claims, bills or other indebtedness incurred in connection with the performance of any [Bonded Contract]"; or

21

c.      If Indemnitors fail to perform or comply with any provision of the Indemnity Agreement.

94.     USACE, as obligee under the Bonds, has declared A4 to be in default of both Bonded Contracts, each constituting an Event of Default under the Indemnity Agreement.

95.     Indemnitors have failed to pay various A4 suppliers and subcontractors, resulting in claims and lawsuits against Surety and the Bonds, each such failure constituting an Event of Default under the Indemnity Agreement.

96.     Indemnitors are in breach of the Indemnity Agreement for, *inter alia*, failure to honor their indemnity obligations thereunder to the Surety, constituting an Event of Default under the Indemnity Agreement.

97.     Under the Indemnity Agreement, any and each Event of Default triggered the Surety's right to enforce its assignment and security interest in all the Collateral.

98.     Under the Indemnity Agreement and Utah law, because Indemnitors are in breach of their obligations under the Indemnity Agreement, Surety is entitled to immediate possession of the Collateral of all Indemnitors.

99.     Surety's rights as an assignee of the Collateral, as well as its security interest in the Collateral, constitute an "ownership or special interest" in the Collateral under applicable law and rules.

100.    Because of their breach of the Indemnity Agreement, the Indemnitors—and each of them—wrongfully retain the Collateral until the full obligation to Surety is satisfied.

101.    The Collateral does not, on information and belief, constitute earnings and is not exempt from execution.

22

102.    The relief sought herein is not sought to hinder, delay, or defraud a creditor of the Indemnitors, or any of them.

103.    On information and belief, certain Collateral is held by and under control of the Indemnitors.

104.    On information or belief, the Collateral has not yet been taken for a tax, assessment or fine or seized under a writ against the property of A4 or the Indemnitors.

105.    There is a substantial likelihood that Surety will prevail on the merits of its underlying claims, including Indemnitors' breaches and default under the Indemnity Agreement.

106.    The actual value of the Collateral is unknown.

107.    Surety is presently unaware of any person or entity claiming an interest in the Collateral, other than Indemnitors.

108.    Surety is entitled to a prejudgment writ of replevin, authorizing the marshal, or other appropriate law enforcement, as directed by the Court, to seize the Collateral from the Indemnitors, and to handle the same in accordance with law, to the end that Surety may sell so much of the Collateral as is necessary to repay Surety for its losses and expenses under the Bonds.

## FIFTH CLAIM FOR RELIEF
### (Injunctive and *Quia Timet* Relief)

109.    Surety realleges and incorporates herein each and every allegation in the foregoing paragraphs.

110.    Surety has both an assignment in and a security interest in all the Collateral, which interests entitle Surety to realize upon the Collateral to satisfy the outstanding indemnity obligation owing to Surety to reimburse and repay Surety for its losses incurred under the Bonds.

23

111. Surety seeks injunctive relief, preventing Indemnitors, and each of them, from altering, discarding, destroying, or hiding any business or financial records, including, without limitation, all records relating to the Bonded Contracts or the Bonds, and all records relating to the money and assets owned by or within the control of Indemnitors.

112. Surety also seeks injunctive relief, if and to the extent that replevin against identifiable Collateral is not granted, to maintain the *status quo* and prevent the Indemnitors from transferring, conveying, selling, assigning, moving, alienating, hiding, destroying, encumbering, disposing of or dissipating the Collateral, or any of it, including the Equipment, cash, cash equivalents, accounts receivable and deposit accounts.

113. Surety also seeks to enjoin Indemnitors from receiving any of the proceeds of the sale of any of the Equipment—or any of the Collateral—to any third party, without satisfying Surety's lien thereon unless and until Surety is completely reimbursed and paid for all losses.

114. Absent that injunctive relief, Surety will be irreparably harmed because Indemnitors will be free to transfer, move, hide, dissipate, or otherwise deal with the Collateral or the Equipment in such a way that will put it out of reach of the Surety, make it unavailable to satisfy Indemnitors' indemnity obligation, and render Indemnitors insolvent and therefore incapable of honoring those obligations.

115. Surety is likely to succeed on the merits of its underlying claims for indemnification, as the plain language of the Indemnity Agreement clearly establishes a duty to indemnify Surety and, despite demands, Indemnitors have failed to do so.

116. The balance of equities and harm tips in favor of Surety; the injunctive relief merely seeks to maintain the status quo and prevent the transfer and dissipation of the Collateral or its proceeds, which will not harm Indemnitors.

24

117.    Absent injunctive relief, Surety is justly apprehensive that the Collateral or its proceeds may disappear, which will harm Surety and eliminate its source of recovery.

118.    The injunctive relief serves the public interest in ensuring that sureties, generally, are protected and can continue providing their key statutory and common-law function in the construction industry.

119.    Under the circumstances, and consistent with equitable principles of *quia timet*, Surety is entitled to injunctive relief, as follows:

a.    Preventing Indemnitors, and all of them, from altering, discarding, destroying or hiding any business or financial records, including, without limitation, all records relating to the Bonded Contracts and all records relating to the money and assets owned by or within the control of Indemnitors;

b.    Preventing Indemnitors, and all of them, from transferring, conveying, selling, assigning, moving, alienating, hiding, destroying, encumbering, disposing of or dissipating the Collateral, or any of it, including, but not limited to, the Equipment, cash, cash equivalents, accounts receivable and deposit accounts (as an alternative to replevin relief), unless and until Surety is completely reimbursed and paid for all losses.

WHEREFORE, Plaintiff Guarantee Company of North America USA prays for judgment against Defendants, jointly and severally, as follows:

1.    Under its First and Second Claims, for judgment against the Indemnitors, jointly and severally, in the total amount of Surety's unreimbursed losses, costs and expenses and liability incurred under or as a result of the Bonds, said amount to be proven at trial or dispositive motion, but in no case less than the current total of Surety's loss reserves of $5,850,000.00 as of the date

25

of this Complaint, together with any additional losses incurred by Surety; prejudgment interest at the legal, statutory rate; Surety's costs and expenses (including attorneys' fees); and such additional amounts as may be necessary to fully reimburse and indemnify Surety against its losses, costs and expenses, incurred hereafter, under or as a result of the Bonds, plus interest on those amounts at the statutory rate.

2.    Under its Third Claim, for an order of specific performance and enforcement of Indemnitors' obligations to Surety under the Indemnity Agreement, including the posting of cash collateral or other security sufficient in type and amount to protect Surety from all losses, costs, expenses, and liabilities under or resulting from the Bonds, whether or not actually incurred, together with an order requiring A4 and the individual Indemnitors having control of its books and records to furnish to Surety complete access to those financial books and records, including, but not limited to those relating to the Bonded Contracts; and

3.    Under its Fourth Claim, for a prejudgment writ of replevin, authorizing the marshal, or other appropriate law enforcement, as directed by the Court, to seize the Collateral from Indemnitors, and to handle the same in accordance with law, to the end that Surety may sell so much of the Collateral as is necessary to repay Surety for its losses and expenses under the Bonds.

4.    Under its Fifth Claim, for the following injunctive and equitable relief:

a.    Preventing Indemnitors, and all of them, from altering, discarding, destroying or hiding any business or financial records, including, without limitation, all records relating to the Bonded Contracts, and all records relating to the money and assets owned by or within the control of Indemnitors;

b.    Preventing the Indemnitors from transferring, conveying, selling, assigning, moving, alienating, hiding, destroying, encumbering, disposing of or

26

dissipating the Collateral, or any of it, including, but not limited to, the Equipment, cash, cash equivalents, accounts receivable and deposit accounts, unless and until Surety is completely reimbursed and paid for all losses (in the event the Court does not grant the replevin relief, as prayed).

5.      On all Claims for Relief:

a.      For interest, both prejudgment and post-judgment, at the legal rate;

b.      For all costs and expenses, including reasonable attorneys' fees expended by Surety in investigating and handling claims, together with all costs and expenses, including attorneys' fees, incurred in the enforcement of the Indemnity Agreement and in this matter.

c.      For such other and additional relief as may be just and proper under the circumstances, including injunctive and other equitable relief deemed appropriate to protect and preserve Surety's rights under the Indemnity Agreement.

DATED this 22 day of April, 2022.

**SNOW CHRISTENSEN & MARTINEAU**

By  _/s/ David W. Slaughter_
    DAVID W. SLAUGHTER
    HEATHER S. WHITE
    SCOTT C. POWERS
    *Attorneys for The Guarantee Company*
    *of North America USA*

Plaintiff's address:
One Towne Square, Suite 1470
Southfield, Michigan 48076

27